United States District Court
For the Northern District of California

1
2
3
4
5          UNITED STATES DISTRICT COURT
6          NORTHERN DISTRICT OF CALIFORNIA
7
8
9
10  IN RE SILICON STORAGE                No. C-05-0295 PJH
    TECHNOLOGY, INC., SECURITIES
11  LITIGATION                           **ORDER GRANTING MOTION
                                         TO DISMISS**
12  _____/

13          Defendants' motion to dismiss the second amended complaint came on for hearing

14  before this court on November 8, 2006.  Defendants appeared by their counsel Robert P.

15  Varian and Jonathan B. Gaskin, and plaintiffs appeared by their counsel Jason S. Cowart,

16  Patrick V. Dahlstrom, and Julie Bai.  At the hearing, the court ordered supplemental

17  briefing, which was completed on November 22, 2006.  Having read the parties' papers and

18  carefully considered their arguments and the relevant legal authority, the court hereby

19  GRANTS the motion.

20                          **INTRODUCTION**

21          This is a proposed class action alleging violations of federal securities laws.

22  Plaintiffs, seeking to represent a class consisting of all those who purchased shares of

23  common stock in defendant Silicon Storage Technology, Inc. ("SST") from April 21, 2004,

24  to December 20, 2004, allege that SST and four of its officers or former officers – President

25  and Chief Executive Officer Bing Yeh ("Yeh"); Chief Operating Officer Yah Wen Hu ("Hu");

26  Chief Financial Officer Jack K. Lai ("Lai"); and Senior Vice President of Sales and

27  Marketing Derek Best ("Best") – misled investors by overstating SST's inventory value and

28  by making false statements about the company's sales prices.

United States District Court

For the Northern District of California

1    Plaintiffs claim that defendants issued false reports in connection with SST's

2  quarterly release of financial results for the first, second, and third quarters of 2004.

3  Plaintiffs assert that they were harmed when the price of SST's stock fell by more than

4  22.5%, following an announcement by the company on December 20, 2004, that it would

5  write down the value of its inventory by $20-25 million.

6    Plaintiffs allege claims for violation of § 10(b) of the Securities Exchange Act of

7  1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, against SST, Yeh, Hu,

8  Lai, and Best; and for violation of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against

9  the four individual defendants.

10    On March 10, 2006, the court dismissed the consolidated amended complaint (CAC)

11  for failure to state a claim, finding that plaintiffs had failed to allege either falsity or scienter

12  with particularity.  Plaintiffs filed the second amended complaint (SAC) on May 1, 2006.

13  Defendants now seek an order dismissing the SAC for failure to state a claim.

14                              **BACKGROUND**

15    SST is based in Sunnyvale, California, where it operates three major facilities.

16  According to periodic reports filed with the Securities Exchange Commission, SST is a

17  leading supplier of "flash memory" semiconductor devices for the digital consumer,

18  including networking, wireless communications, and Internet computing markets.  SST

19  offers over 90 products based on its "Super-Flash" design and manufacturing process

20  technology, and also licenses its technology to leading semiconductor companies for use in

21  various applications.  Revenue from the sale of these products contributed approximately

22  50% of the company's revenue during the proposed class period.

23    In its Form 10-K for 2003, filed in March 2004 (a month before the commencement

24  of the class period), SST reported that it had experienced a "slow recovery" from previously

25  depressed conditions, but that during the second half of 2003, "demand for our products

26  increased sharply and we began to see improvements in the average selling prices of our

27  products."  The Form 10-K warned investors that SST's business was cyclical, with

28  downturns characterized by "supply and demand imbalance," "weak product demand,

                                      2

1    excessive inventory, and accelerated declines of selling prices," and that despite generally

2    positive trends, SST's business could be "harmed by industry-wide prolonged downturns in

3    the future."  The 10-K also cautioned that customer demand was unpredictable, and that

4    changes in average selling prices could result in a significant adjustment and could harm

5    SST's financial results.

6         In its Form 10-Q for 1Q 2004, filed with the SEC on May 7, 2004, SST reported that

7    average selling prices had increased 16.1% over the previous quarter, and 23.6% over the

8    first quarter of 2003.  The company also noted that although the positive trends had

9    continued through the first quarter, its business could be harmed by a reversal of those

10   trends.

11        According to its Form 10-Q for 2Q 2004, filed on August 5, 2004, SST's product

12   demand and pricing continued to improve.  In its October 20, 2004, earnings release,

13   however, SST reported that revenues, shipments, and average sales prices had declined,

14   in part because "digital consumer shipments declined 14 per cent following [SST's] record

15   shipments of nearly 70 million units" in 2Q04.

16        SST subsequently determined that a write-down of inventory would be required in

17   the fourth quarter of 2004.  On December 20, 2004, before the end of the fourth quarter,

18   SST announced that it expected to "record an inventory charge of between $20 and $25

19   million for excess inventory and to write certain products down to their current estimated

20   market values."  SST indicated that "[t]he shortfall in revenue is primarily due to lower than

21   expected demand across all segments and decreased average selling prices caused by

22   industry-wide oversupply and increased competition."

23        Plaintiffs assert that "the truth began to emerge" after SST announced the inventory

24   write-down.  They allege that on the news of the planned write-down, the price of the

25   company's shares, which had closed at $7.01 before the announcement, fell to a low of

26   $5.43 the following day, a drop of 22.5%.

27        On March 31, 2005, SST filed its 2004 Form 10-K with the SEC.  The 10-K included

28   a report from SST's external auditor, PricewaterhouseCoopers, LLP.  The auditor stated:

United States District Court

For the Northern District of California

1

2
As of December 31, 2004, the Company did not maintain effective
controls over accounting for and review of the valuation of inventory . . . .

3
Specifically, the Company lacked sufficient controls over the writedown of
inventory to its lower of cost or market. . . . This . . . deficiency resulted in an

4
audit adjustment to the 2004 consolidated financial statements related to the
write-down of inventory to the lower of cost or market.  Additionally, this

5
deficiency could result in a material misstatement to the annual or interim
consolidated financial statements that would not be prevented or detected.

6
SAC ¶ 123.

7
**DISCUSSION**

8
A.    Legal Standard

9
        A court should dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to

10
state a claim only where it appears beyond doubt that plaintiff can prove no set of facts in

11
support of the claim which would entitle the plaintiff to relief.  Conley v. Gibson, 355 U.S.

12
41, 45-46 (1957); Williamson v. Gen'l Dynamics Corp., 208 F.3d 1144, 1149 (9th Cir.

13
2000).  All allegations of material fact are taken as true and construed in the light most

14
favorable to the nonmoving party.  Gompper v. VISX, Inc., 298 F.3d 893, 895 (9th Cir.

15
2002).

16
        Review is generally limited to the contents of the complaint.  Allarcom Pay

17
Television, Ltd. v. Gen. Instrument Corp., 69 F.3d 381, 385 (9th Cir. 1995).  However,

18
material that is properly presented to the court as part of the complaint may be considered

19
as part of a motion to dismiss.  Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir.

20
2001).  If a plaintiff fails to attach to the complaint the documents on which it is based,

21
defendant may attach to a Rule 12(b)(6) motion the documents referred to in the complaint

22
to show that they do not support plaintiff's claim.  Id.  In addition, whether requested or not,

23
the court may take judicial notice of facts that are capable of accurate and ready

24
determination by resort to sources whose accuracy cannot be questioned.  Fed. R. Evid.

25
201; see also In re Silicon Graphics, Inc., Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999).

26
B.    Defendants' Motion to Dismiss

27
        Defendants seek an order dismissing the SAC for failure to state a claim.  They

28
contend that the SAC fails to allege particularized facts showing that the alleged false and

4

**United States District Court**

For the Northern District of California

1   misleading statements were false when made, or that defendants knew they were false.

2   Defendants also contend that the SAC fails to plead a claim of control-person liability,

3   because it fails to allege a primary violation.

4       Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to

5   use or employ in connection with the purchase or sale of any security registered on a

6   national securities exchange or any security not so registered, any manipulative or

7   deceptive device or contrivance in contravention of such rules and regulations as the [SEC]

8   may prescribe."  15 U.S.C. § 78j(b).

9       SEC Rule 10b-5, promulgated under the authority of § 10(b), makes it unlawful for

10  any person to use interstate commerce

11      (a) To employ any device, scheme, or artifice to defraud,

12      (b) To make any untrue statement of a material fact or to omit to state a
    material fact necessary in order to make the statements made, in the light of
13      the circumstances under which they were made, not misleading, or

14      (c) To engage in any act, practice, or course of business which operates or
    would operate as a fraud or deceit upon any person, in connection with the
15      purchase or sale of any security.

16  17 C.F.R. § 240.10b-5.

17      To plead securities fraud under Section 10(b) of the 1934 Act, plaintiffs must allege

18  (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which

19  plaintiffs relied (5) which proximately caused the plaintiffs' injury.  DSAM Global Value Fund

20  v. Altris Software, Inc., 288 F.3d 385, 388 (9th Cir. 2002).  Similarly, the elements of a Rule

21  10b-5 claim are (1) a material misrepresentation (2) made with scienter (3) in connection

22  with the purchase or sale of a security, (4) transaction and loss causation, and

23  (5) economic loss.  In re Daou Sys., Inc., Sec. Litig., 411 F.3d 1006, 1014 (9th Cir. 2005).

24      Under § 20(a) of the 1934 Act, joint and several liability can be imposed on persons

25  who directly or indirectly control a violator of the securities laws. 15 U.S.C. § 78t(a).

26  Violation of § 20(a) is predicated on a primary violation under the 1934 Act.  Heliotrope

27  Gen'l, Inc. v. Ford Motor Co., 189 F.3d 971, 978 (9th Cir. 1999).  Plaintiffs alleging a claim

28  that individual defendants are "controlling persons" of a company must allege (1) a primary

5

violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator.  No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Co., 320 F.3d 920, 945 (9th Cir. 2003); see also Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000).

Generally, the Federal Rules of Civil Procedure require that a plaintiff in federal court give a short, plain statement of the claim sufficient to put the defendant on notice.  See Fed. R. Civ. P. 8(a).  However, Rule 9 imposes a particularized pleading requirement on a plaintiff alleging fraud or any claim premised on fraud.  See Fed. R. Civ. P. 9(b) (in actions alleging fraud, "the circumstances constituting fraud or mistake shall be stated with particularity").

Under Rule 9(b), the complaint must allege specific facts regarding the fraudulent activity, such as the time, date, place, and content of the alleged fraudulent representation, how or why the representation was false or misleading, and in some cases, the identity of the person engaged in the fraud.  In re GlenFed Sec. Litig., 42 F.3d 1541, 1547-49 (9th Cir. 1994).  Because the plaintiff must set forth what is false or misleading about a particular statement, he must do more than simply allege the neutral facts necessary to identify the transaction; he must also explain why the disputed statement was untrue or misleading at the time it was made.  Yourish v. California Amplifier, 191 F.3d 983, 992-93 (9th Cir. 1999).

This case is also controlled by the provisions of the Private Securities Litigation Reform Act ("PSLRA"), which was enacted by Congress in 1995 to establish uniform and stringent pleading requirements for securities fraud actions, and to put an end to the practice of pleading "fraud by hindsight."  In re Silicon Graphics, 183 F.3d at 958.  The PSLRA heightened the pleading requirements in private securities fraud litigation by requiring that the complaint plead both falsity and scienter with particularity.  In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1084 (9th Cir. 2002); see also In re Daou, 411 F.3d at 1014.  If the complaint does not satisfy these pleading requirements, the court, upon motion of the defendant, must dismiss the complaint.  15 U.S.C. § 78u-4(b)(3)(A).

1    1.    Falsity

2         Plaintiffs allege that throughout the proposed class period, defendants made false or

3    misleading statements concerning SST's sales prices and the value of its inventory, which

4    in turn caused the company's statements of gross profit, net income, and total assets to be

5    materially misleading.

6         Defendants contend that the SAC fails to allege falsity, because it includes no

7    specifics showing that any of the alleged false statements were false when made, because

8    the inventory valuations are self-serving fabrications, because the cost figures are vague

9    and bear no relationship to the actual cost of SST's inventory, and because plaintiffs fail to

10   plead facts showing that any of defendants' statements was actually false or misleading

11   when made.

12        Under the PSLRA – whether alleging that a defendant "made an untrue statement of

13   a material fact" or alleging that a defendant "omitted to state a material fact necessary in

14   order to make the statements made, in the light of the circumstances in which they were

15   made, not misleading" – the complaint must specify each statement alleged to have been

16   false or misleading, specify the reason or reasons why each such statement is misleading,

17   and, if an allegation regarding the statement or omission is made on information and belief,

18   state with particularity all facts on which that belief is formed.  15 U.S.C. § 78u-4(b)(1).  If

19   the challenged statement is not false or misleading, it does not become actionable merely

20   because it is incomplete.  In re Vantive, 283 F.3d at 1085; Brody v. Transitional Hosp.

21   Corp., 280 F.3d 997, 1006 (9th Cir. 2002).

22        In the SAC, plaintiffs allege that defendants made false or misleading statements

23   regarding SST's sales prices and inventory valuation in connection with the release of

24   SST's financial results for the first, second, and third quarters of 2004.

25        With regard to 1Q04, SST issued a press release on April 21, 2004 (the first day of

26   the class period) stating that SST's inventory was worth $69.9 million at the end of 1Q04,

27   and that SST's "average selling prices across all densities" had improved.  SAC ¶ 77.  Also

28   on April 21, 2004, Yeh stated in a conference call that the most significant factor affecting

United States District Court

For the Northern District of California

7

United States District Court
For the Northern District of California

SST's gross margin in 1Q04 was the "continued firming of our average selling prices across all densities," and that SST's blended average sales price "improved sequentially, roughly 10%, excluding product mix" during that period.  SAC ¶ 78.

SST's Form 10-Q for 1Q04, filed May 6, 2004, repeated the statement that SST's inventory was worth $69.9 million as of the end of 1Q04; and indicated that the process by which inventory values were calculated was GAAP-compliant in that "[i]nventories are stated at the lower of cost . . . or market value."  SAC ¶ 80.  Also in the 10-Q, Yeh and Lai certified that, to the best of their knowledge, the 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein not misleading.[1]  SAC ¶ 81.

Plaintiffs allege that these statements concerning the 1Q04 financial results were false and misleading for three reasons.  First, they assert that the value of SST's total inventory was overstated, because it was inflated by $3,890,000, and that SST's gross profit, income from operations, and cost of revenue were consequently understated.  SAC ¶ 83.  Second, they contend that SST's inventory was not stated at the lower of cost or market, and that Yeh's and Lai's certifications were made with deliberate recklessness.  SAC ¶ 84.  They also claim that SST's internal controls for inventory valuations were deliberately reckless insofar as they were designed to allow defendants to manipulate inventory values, and assert that defendants controlled the inventory valuation process so as to allow for various GAAP violations.  Id.  Third, they allege that the prices of SST's products were not "firming" or "improving," as reported, but were, in fact, decreasing.  SAC ¶ 85.  They claim that defendants' statements regarding SST's prices "led the market to

---

[1]  This 302 Sarbanes-Oxley certification stated, in effect, that (a) the 10-Q did not contain any false or misleading statement with respect to the covered period; (b) the financial information in the 10-Q accurately represented SST's financial condition, results of operations, and cash flows for the covered period; (c) Yeh and Lai designed and maintained disclosure controls and evaluated the effectiveness of those disclosure controls; (d) Yeh and Lai disclosed in the 10-Q any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting; (e) Yeh and Lai disclosed any fraud that involved management or other employees with a significant role over financial reporting.  SAC ¶ 81.

United States District Court

For the Northern District of California

believe that [SST] was immune from downward pricing pressure." SAC ¶ 89.

With regard to 2Q04, SST issued a press release on July 21, 2004, stating that SST's inventory was worth $91 million at the end of 2Q04, and that the company had experienced "firming" selling prices during 2Q04. SAC ¶ 90. SST's Form 10-Q for 2Q04, filed August 5, 2004, repeated the statement that SST's inventory was worth $91 million as of the end of 2Q04. SAC ¶ 91. The 10-Q indicated that the process by which inventory values were calculated was GAAP-compliant in that "[i]nventories are stated at the lower of cost . . . or market value." SAC ¶ 92. Also in the 10-Q, Yeh and Lai certified that, to the best of their knowledge, the 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein not misleading.[2] Id.

Plaintiffs allege that these statements concerning the 2Q04 financial results were false and misleading for three reasons. First, they assert that the value of SST's total inventory was overstated, because it was inflated by $2,701,000, and that SST's gross profit, income from operations, and cost of revenue were consequently understated. SAC ¶ 94. Second, they contend that inventory was not stated at the lower of cost or market, and that Yeh's and Lai's certifications were made with deliberate recklessness. SAC ¶ 95. They also claim that SST's internal controls for inventory valuations were deliberately reckless insofar as they were designed to allow defendants to manipulate inventory values, and assert that defendants controlled the inventory valuation process so as to allow for various GAAP violations. Id. Third, they allege that the prices of SST's products were not "firming," as reported, but were, in fact, decreasing. SAC ¶ 96.

With regard to 3Q04, SST issued a press release on October 20, 2004, stating that SST's inventory was worth $138,990,000 at the end of 3Q04. SAC ¶ 101. SST's Form 10-Q for 3Q04, filed November 15, 2004, repeated that statement. SAC ¶ 102. The 10-Q indicated that the process by which inventory values were calculated was GAAP-compliant in that "[i]nventories are stated at the lower of cost . . . or market value." SAC ¶ 103. Also

---

[2] See n.1, above.

United States District Court

For the Northern District of California

1   in the 10-Q, Yeh and Lai certified that, to the best of their knowledge, the 10-Q did not

2   contain any untrue statement of a material fact or omit to state a material fact necessary to

3   make the statements therein not misleading.[3]  Id.  When Lai was asked in an October 20,

4   2004, conference call whether SST would have to "take a write-down," Lai stated, "[W]e

5   should be okay."  SAC ¶ 108.

6       Plaintiffs allege that these statements concerning the 3Q04 financial results were

7   false and misleading for three reasons.  First, they assert that the value of SST's total

8   inventory was overstated, because it was inflated by $10,482,000, and that SST's gross

9   profit, income from operations, and cost of revenue were consequently understated.  SAC

10  ¶ 105.  Second, they contend that inventory was not stated at the lower of cost or market,

11  and that Yeh's and Lai's certifications were made with deliberate recklessness.  SAC

12  ¶ 106.  They also claim that SST's internal controls for inventory valuations were

13  deliberately reckless insofar as they were designed to allow defendants to manipulate

14  inventory values, and assert that defendants controlled the inventory valuation process so

15  as to allow for various GAAP violations.  Id.  Third, with regard to Lai's statement during the

16  October 20, 2004, conference call, plaintiffs suggest that the statement was misleading

17  because SST did in fact take a write-down two months later.  Plaintiffs claim that

18  defendants knew or should have known that the actual market price of flash memory and

19  the value SST was assigning to its inventory were growing further and further apart, and

20  that an immediate write-down was required.  SAC ¶ 109.

21      In sum, the SAC alleges five categories of false statements:  (1) statements

22  regarding the value of SST's inventory, made in three SST press releases and in the 10-Qs

23  for the first three quarters of 2004; (2) statements in the certifications signed by Yeh and

24  Lai in the 10-Qs for the first three quarters of 2004, that SST's inventory was stated at the

25  lower of cost or market value, and that inventory was stated in compliance with GAAP;

26  (3) statements in the certifications signed by Yeh and Lai in the 10-Qs for the first three

27

28      _____

        [3]  See n.1, above.

United States District Court

For the Northern District of California

quarters of 2004, that all statements in the 10Qs were true; (4) statements in press releases relating to issuance of financial results for the first two quarters of 2004, and in one related conference call, that the sales prices of SST's products were "firming" or "improving;" and (5) statement that "we should be okay," made by Lai during the October 20, 2004, conference call, in response to a question regarding whether SST would take a write-down.

Plaintiffs support their assertions of falsity and scienter with allegations of information obtained from confidential witnesses, and with allegations that the individual defendants attended regularly-scheduled meetings at SST and reviewed certain reports.

In the CAC, plaintiffs alleged facts based on information obtained from six "informants," five of whom were "confidential informants." The court found that none of these informants could have had any relevant information regarding defendants' statements concerning inventory valuation or sales prices during the class period, because all six informants had left their employment at SST prior to the commencement of the proposed class period.

In the SAC, plaintiffs support their claims with allegations of facts obtained from 19 "confidential informants." See SAC ¶ 33. Of those 19 informants, ten (including the original five listed in the CAC) did not work at SST during the 8-month proposed class period (CI ## 1-5, 10, 11, 13, 14, 16).[4] Six worked at SST throughout the class period (CI ## 7, 8, 12, 15, 17, 19). Three worked at SST for a portion of the class period (CI # 6, through October 2004; CI # 9, through June 2004; and CI # 18, from May 2004 through the end of the class period). As with the CAC, the court does not consider any facts or information regarding events during the proposed class period which are attributed to the informants who were not present at SST during the proposed class period.

In the CAC, plaintiffs referred generally to "reports" discussing excess inventory at SST, and to "monthly and quarterly meetings" where inventory valuation was discussed.

_____

[4] Three of these (## 1, 10, and 11) worked at SST until April 2004, and so were present during 1Q04, the quarter that preceded the proposed class period.

1   However, in dismissing the CAC, the court found that plaintiffs had failed to cite to any

2   specific report, to mention any dates or contents of reports, or to allege the source of

3   information about any reports, and also failed to provide any specifics regarding the

4   defendants' alleged attendance at the meetings.

5           In the SAC, plaintiffs provide a list of 21 "Databases and Reports" generated at SST,

6   and also state (for many of the databases and reports) which defendants and which

7   informants and other SST employees had access to them.  See SAC ¶ 38.  Plaintiffs also

8   provide a list of seven types of regularly scheduled meetings; state the general topic(s) of

9   discussion at those meetings and identify some of the SST employees who attended.  See

10  SAC ¶ 39.

11          For the most part, the allegations relating to the reports and databases provide no

12  specific, particularized information that contradicts defendants' representations about SST's

13  inventory values or sales prices.  For example, plaintiffs allege that the "Work-in-Progress

14  Access" database tracked inventory, but they provide no specifics about any products in

15  SST's inventory or the costs or prices of those products.  In addition, the only two

16  "confidential informants" alleged to have had information about this database left their

17  employment at SST well before the commencement of the proposed class period in April

18  2004:  CI # 2 worked at SST until August 2002, and CI # 3 worked at SST until June 2003.

19  See SAC ¶¶  38(a), 33(b), (c).

20          Similarly, plaintiffs allege that the "Brainstorm" database was used to make six-

21  month budget projections, and claim that unidentified "budgeting managers" and CI #16

22  (who worked at SST until September 2003) had access to this database.  However, they

23  provide no connection between any information in this database and any alleged false or

24  misleading statement at issue in the case.  See SAC ¶ 38(d), 33(p).

25          Indeed, most of the allegations relating to the 19 databases provide only a vague

26  description, unconnected to any other allegations in the SAC – e.g., the "Discovery"

27  database, allegedly used "in connection with reviewing and quantifying commissions for

28  North American sales representatives, SAC ¶ 38(g); the "EMTTD" database, which

12

United States District Court
For the Northern District of California

allegedly "tracked the movement of all materials" from SST destinations worldwide, SAC ¶ 38(h); the "Lot Space Tracking" database, which allegedly "functioned as an inventory tracking system, SAC ¶ 38(i); the monthly "Point of Sale" reports, which allegedly "provided details on the products [SST] sold to its customers, SAC ¶ 38(q); and the "Booking" reports, which allegedly provided information on what products were shipped to which customers," SAC ¶ 38(s).

The only reports or databases as to which the court was able to locate any mention following the list of "Databases and Reports" set forth in SAC ¶ 38, are the "Minimum Price" list, the "EFlash" database, the "Oracle ERP" database, and "Hu's Excel" database. However, plaintiffs refer to all four of these databases in their allegations of scienter. None of the information in the databases is used to support plaintiffs' claim that SST's prices were not "firming" or "improving," or the allegation that defendants overstated the value of SST's inventory.

Similarly, apart from providing details of "regularly scheduled meetings," plaintiffs plead no particularized facts obtained from those meetings which are also in conflict with defendants' representations regarding SST's financial results. Many of the allegations regarding meetings are based on statements by various "confidential informants" concerning pre-class period events. See, e.g., SAC ¶ 224(b) (CI ## 2 and 3 stated that SST's former CFO told employees at quarterly meetings in 2002 and 2003 that SST needed to write down inventory values); SAC ¶ 225 (CI # 4 stated there were numerous "red flags" regarding inventory at monthly meetings he/she attended through April 2003). Moreover, as discussed in more detail below, plaintiffs allege that SST employees complained at quarterly sales meetings that market prices (not SST's prices) were falling. See SAC 73(a), (b).

In the order dismissing the CAC, the court found that the complaint failed to allege falsity because it did not contain allegations of contemporaneous conditions or statements by defendants contradicting SST's statements regarding inventory valuations, and because it did not plead facts showing the specific reasons that the allegedly false statements were

13

United States District Court
For the Northern District of California

1   false when made.  Defendants argue that the SAC suffers from the same defect, and fails

2   to allege falsity because the plaintiffs plead no specific facts showing that defendants'

3   statements were false or misleading, and because the SAC's "inventory valuations" are

4   self-serving fabrications.

5          Defendants assert that the SAC is pled almost entirely on information and belief, and

6   that with the exception of two "snippets" attributed to Yeh and Lai, and the notation that

7   Yeh and Lai signed SST's Form 10-Qs, the SAC does not allege that any particular

8   defendant made any of the statements at issue.  Defendants also contend that the SAC

9   fails to allege particularized facts showing how or why the statements at issue were false

10  and misleading when made; and fails to allege any specifics regarding the dates, contents,

11  authors, participants, or recipients of any contemporaneous meeting, memorandum, or

12  report that might cast doubt on any supposed misstatement.

13         In response, plaintiffs argue that the statements regarding the valuation of inventory

14  and SST's general business prospects were false when made because the market prices of

15  flash memory were falling generally, and because the market value of SST's inventory was

16  less than the cost of that inventory.  Plaintiffs contend that the SAC alleges the amount of

17  the overstatement of inventory value, and alleges new facts that establish that defendants'

18  assertions that prices were rising in 1Q04 and 2Q04 were false, that defendants' inventory

19  valuation in 3Q04 was false, and that SST's stated inventory values were inflated and were

20  based on the false assumption that market values were rising.

21                 a.     statements re valuation of inventory

22         Defendants argue that the allegations that defendants overstated the value of SST's

23  inventory fail to state a claim because plaintiffs plead no facts regarding the cost or price of

24  any product in SST's inventory.

25         In the CAC, plaintiffs alleged that because the market prices of the products in SST's

26  inventory had fallen below costs in 2004, the inventory values should have been properly

27  written down to account for this decrease.  In support, they asserted that the market price

28  for various types of flash memory manufactured and sold by Intel and AMD had declined

14

United States District Court
For the Northern District of California

between April 2004 and December 2004, and that defendants knew or should have known that the prices of these products, which competed with SST's products, were falling. However, the CAC stated no facts regarding comparable products in SST's inventory or the cost or market price of those products.  At the hearing on the motion to dismiss the CAC, plaintiffs' counsel essentially conceded that plaintiffs had no such information regarding the cost or market value of SST's products.

The parties agree that GAAP requires that inventory be valued at the cost of producing it, unless and until its market price drops below cost.  See ARB No. 43, Chap. 4, Statement 5.  In the order dismissing the CAC, the court found that plaintiffs had failed to meet the pleading requirements of the PSLRA, in part because they alleged no facts regarding the products in SST's inventory, or the cost or market price of those products.

In addition, the court found that the allegations regarding the decline in prices for flash memory produced by Intel and AMD did not support the claim that defendants had made false statements regarding SST's financial results during the first three quarters of 2004, in part because the inventory charge was taken primarily on SST's 8-megabit and 16-megabit flash memory, while the Intel and AMD products referenced in the CAC were 4-, 8-, 16-, and 32-megabyte flash memory, products that did not compete with products sold by SST.

In the SAC, plaintiffs again assert that because the market prices of SST's inventory had fallen below costs in 2004, the inventory values should have been properly written down to account for this decrease.  SAC ¶ 129.  They allege generally that "competition was driving [SST's] flash memory prices down," claiming that throughout 2004, Intel "actively engaged in the flash memory market and increased its flash memory unit sales by lowering flash memory prices."  SAC ¶ 53.  Plaintiffs also assert that "it was well known" that Samsung, AMD, Fujitsu, Atmel, Winbond, Actrans, EON Silicon Solution (Taiwan), Macronix International Co. Ltd. (Taiwan), PMC Flash (San Jose, California), and AMIC (Taiwan) were also selling flash memory products that "competed with" products sold by SST.  SAC ¶ 54.

15

United States District Court

For the Northern District of California

1    Plaintiffs' only factual support for these allegations are the claims that certain

2  unnamed SST employees (some of whom did not work at SST during the proposed class

3  period) confirmed that Intel and the other companies mentioned above were competitors of

4  SST, and that SST itself stated in its 2004 Form 10-K that products manufactured by these

5  companies competed with SST's products.  However, these allegations are no more

6  adequate than the ones in the CAC, as they state no facts regarding the cost or market of

7  the specific products manufactured by SST.

8    Plaintiffs claim, however, that the average cost and market values of SST's inventory

9  can be calculated on a quarterly basis, using SST's public filings and generic market data

10  obtained from Selantek, Inc. ("Selantek"), which plaintiffs identify as "a market research firm

11  specializing in semiconductor market research (including pricing information)."  SAC ¶ 56.

12  Plaintiffs allege that based on these calculated values, the amounts by which SST allegedly

13  overstated its inventory values and profits can be computed.  SAC ¶ 133.

14    Plaintiffs first provide charts summarizing their claim of "key misstated data."  SAC

15  ¶¶ 134-135.  They then set forth a convoluted and incomprehensible "methodology" of

16  calculating "average market values" and "average unit costs" of flash memory in SST's

17  inventory, "actual inventory values," and "required allowances" for overvalued inventory in

18  1Q04, 2Q04, and 3Q04.  See SAC ¶¶ 128-188.  Plaintiffs' explanation of the "methodology"

19  is particularly confusing because it requires the reader to jump back and forth between

20  various paragraphs of the SAC.[5]

21    For example, SAC ¶ 141 purports to explain how to calculate "actual inventory

22  value" and the "appropriate inventory allowance."  SAC ¶ 141 refers in turn to SAC ¶¶ 161-

23  163 and 145-147.  In ¶¶ 161-163, in three sentences beginning with "[t]hus," plaintiffs

24  purport to set forth the dollar amount of SST's "average unit cost for goods in inventory" in

25  1Q04, 2Q04, and 3Q04.  "Thus" normally signals a conclusion.  Accordingly, the court looks

26

27 _____
    [5]  District courts in the Ninth Circuit have repeatedly chastised plaintiffs in securities
28  fraud suits for this kind of "puzzle-style" pleading.  See, e.g., In re Splash Tech. Holdings, Inc.
    Sec. Litig., 160 F.Supp. 2d 1059, 1073-75 (N.D. Cal. 2001).

United States District Court

For the Northern District of California

1  back to the beginning of the section containing ¶¶ 161-163 – to ¶ 158 – which refers in turn

2  to the "average unit inventory cost" at the end of 2003 and 2004, set forth in ¶ 152

3  (referring to the "average unit cost of inventory" based on Selantek data), and ¶ 157

4  (referring to the "average unit inventory cost" at the end of 2004), based – as stated in

5  ¶ 156 – on the methodology discussed in ¶ 136 (the Selantek data).

6      Paragraph ¶ 141 also refers to ¶¶ 145-147 ("application of methodology to facts").

7  In that section, plaintiffs allege that the Selantek data "indicates that the average unit

8  market value of flash memory densities sold by [SST]" fell from $2.03 in 4Q03 to $1.89 in

9  1Q04; then fell to $1.84 in 2Q04; and then fell to $1.76 in 3Q04.  Nevertheless, despite all

10  this verbiage, or perhaps because of it, the court can still find no clear explanation of how to

11  calculate SST's "actual inventory value."

12      Compounding the confusion is plaintiffs' account of the actual "methodology."

13  Plaintiffs first explain that they used the Selantek data to calculate the "average unit market

14  value" of "finished flash memory" held in SST's inventory for 4Q03 and all four quarters of

15  2004.  According to plaintiffs, they made this calculation using Selantek's "market value"

16  data concerning "average sales prices" for sales of 2-, 4-, 8-, and 16-megabit products in

17  "Asia" because 87% of SST's sales were of 2-, 4-, 8-, and 16-megabit products in "Asia."

18  SAC ¶ 136.

19      Second, plaintiffs calculate the "average unit cost" of SST's inventory based on the

20  percentage relationship between (i) the value of SST's finished and consigned goods held

21  in inventory before an allowance was taken to account for excess and obsolete inventory

22  and inventory where the price had fallen below cost, and (ii) the amount of the allowance

23  actually taken to account for those "market realities."  SAC ¶ 137.  Plaintiffs claim that this

24  percentage represents the amount by which SST's actual costs exceeded actual market

25  values.  SAC ¶ 138.  Plaintiffs apply this percentage to the "average market value" of SST's

26  flash data, as they calculated it based on the Selantek data, see SAC ¶ 136, to determine

27  the "average unit cost" of flash memory in inventory as of year-end 2003 and 2004.  SAC

28  ¶ 139.  They then compare the year-end 2003 "average unit costs" with the year-end 2004

United States District Court
For the Northern District of California

"average unit costs," and then "ratably apportion[ ]" the decline in costs to each quarter's "average inventory unit costs."  SAC ¶ 140.

Third, plaintiffs calculate the "actual inventory value" and the "appropriate inventory allowance" in 1Q04, 2Q04, and 3Q04 by comparing the "average quarterly inventory unit costs," set forth in SAC ¶¶ 161-163, to SST's average quarterly inventory unit market values (based on the Selantek data) to determine the percentage by which SST's "actual inventory unit costs" exceeded "actual inventory market values" for each quarter.  SAC ¶ 141.  They then apply this percentage to the "quarterly value" of SST's finished and consigned goods held in inventory, before any allowance was taken to account for excess and obsolete inventory and inventory written down to the lower of cost or market, to determine the inventory allowance that should have been taken.  SAC ¶ 142.

Plaintiffs next explain that because SST did not report the portion of the inventory allowance that was taken to account for excess and obsolete inventory and inventory written down to the lower of cost or market, they (plaintiffs) have utilized the following calculation to figure this value:  They add the "total inventory allowance value" (which includes allowance for excess and obsolete inventories, write-down of inventories and adverse purchase commitments) as stated in SST's 10-K for 2003, to the "provision for excess and obsolete inventories, write-downs of inventories and adverse purchase commitments" set forth in the 10-Q for the relevant quarter, and subtract the "total valuation adjustments to inventory" and the allowance for adverse purchase commitments set forth in the 10-Q for the relevant quarter.  SAC ¶ 143.  They then compare the value of the allowance they claim should have been taken to the calculated allowance that actually was taken.  SAC ¶ 144.

After setting forth the above-described "methodology" in SAC ¶¶ 136-144, plaintiffs present  the "application of [the] methodology to facts," in ¶¶ 145-184, as follows.  First, again based on the generic Selantek data, they calculate that the "average unit market value" of flash memory densities sold by SST during 1Q04 fell from $2.03 in 4Q03 to $1.89 in 1Q04, a decrease of 6.9%; that the "average unit value" of flash memory densities sold

18

United States District Court

For the Northern District of California

by SST during 2Q04 was $1.84, a decrease of 2.58% from 1Q04; and that the "average unit value" of flash memory densities sold by SST during 3Q04 was $1.76, a decrease of 4.35% from 2Q04.  SAC ¶¶ 145-147.

Second, they calculate the "average unit cost" of SST's inventory as of the end of 2003.  They assert that based on the financial statements in SST's 2003 Form 10-K, SST had set aside $11,216,000 as an allowance to account for the excess and obsolete inventory and inventory where carrying costs exceeded market value; and that as of the same time, the value of the finished and consigned goods held in inventory was $25,336,000 before any allowance had been taken to account for excess and obsolete inventory and inventory where the price had fallen below cost.  SAC ¶¶ 149-150.  Thus, plaintiffs allege, the total value of the finished goods and consigned inventory had been reduced by 44% due to market price declines ($11,216,000 divided by $23,336,000).  SAC ¶ 150.  In other words, they assert, the cost of finished and consigned goods held in inventory exceeded actual value by approximately 44%.  Id.

Plaintiffs claim that because SST's "average unit cost" of inventory exceeded its "average unit market value" of inventory by approximately 44%, and the average unit value of inventory was $2.03 (calculated based on the generic Selantek data), it is therefore reasonable to assume that the "average unit cost" of SST's inventory was $3.64 as of December 31, 2003.  SAC ¶ 152.

Third, plaintiffs perform a similar calculation to come up with the "average unit cost" of SST's inventory as of the end of 2004.  They conclude that the total value of the finished goods and consigned inventory before the allowance was taken ($98,294,000) had been reduced by 33% ($32,182,000 – the amount of the allowance), and that the cost of the finished and consigned goods held in inventory therefore exceeded the actual value by approximately 33%.  Taking Selantek's "average unit market value" of finished flash memory in SST's inventory at 4Q04 – $1.63 – and increasing by 33%, plaintiffs assert that it is reasonable to assume that the average unit cost of SST's inventory was $2.42 in 4Q04.  SAC ¶¶ 153-157.

United States District Court

For the Northern District of California

Next, using the "average unit cost" of inventory as of the end of 2003 ($3.64, per SAC ¶ 152), compared to the "average unit cost" of inventory at the end of 2004 ($2.42, per SAC ¶ 157), plaintiffs calculate that SST's unit costs of goods held in inventory declined by $1.22 per unit from December 31, 2003, to December 31, 2004.  SAC ¶ 158.  Plaintiffs then allocate that decrease across the four quarters of 2004, and calculate that SST's unit costs declined by approximately $0.30 per quarter.  They deduct $0.30 each quarter, and come up with "average unit costs for goods held in inventory" of $3.34 for 1Q04; $3.03 for 2Q04; and $2.72 for 3Q04.  SAC ¶¶ 160-163.

Plaintiffs assert that because the "average unit cost" of SST's inventory was $3.34 for 1Q04, and the "average unit market value" of such inventory was $1.89 for 1Q04 (per SAC ¶ 145, calculated based on the generic Selantek data), the "average unit inventory cost" exceeded the "average unit inventory market value" by 43%.  SAC ¶ 164.  Next, using the methodology described in SAC ¶¶ 136-144, plaintiffs calculate that the 1Q04 value of SST's finished and consigned goods held in inventory before an allowance was taken to account for excess and obsolete inventory was $31,199,000.  SAC ¶ 165.

Plaintiffs claim that because the "average unit cost" exceeded the "average unit market value" by 43% during 1Q04 – referring back to SAC ¶ 164 – the required allowance should have been $13,544,000, or 43% of $31,199,000.  SAC ¶ 166.  However, according to plaintiffs, the "methodology" described in ¶¶ 136-144 produces a 1Q04 allowance taken to account for excess and obsolete inventory of $9,654,000.  SAC ¶ 167.  Thus, plaintiffs assert, defendants materially understated the 1Q04 allowance by $3,890,000, and overstated the value of the finished inventory by the same amount.  SAC ¶ 168.  In addition, plaintiffs claim, because the inventory value was overstated, the revenue, profit, and income from operations were also overstated.  SAC ¶ 170.

Plaintiffs perform similar calculations for 2Q04, see SAC ¶¶ 171-177, and 3Q04, see SAC ¶¶ 178-184.  They conclude that the defendants materially understated the allowance for 2Q04 by $2,701,000, and overstated the inventory value by the same amount for that period; and that defendants materially understated the allowance for 3Q04 by $10,482,000,

United States District Court

For the Northern District of California

1   and overstated the inventory value by the same amount for that period.   Thus, according to

2   plaintiffs, the $20-25 million write-down in inventory that SST announced on December 20,

3   2004, would have been approximately $17,073,000 less if defendants had not overstated

4   the value of SST's inventory in statements of financial results for the first three quarters of

5   2004.  SAC ¶¶ 185-188.

6         Defendants argue that the SAC should be dismissed because plaintiffs fail to plead

7   facts showing that any of defendants' statements were false or misleading, and also fail to

8   plead particularized, contemporaneous facts to support the alleged overvaluation of

9   inventory.  In particular, defendants assert that the SAC's "inventory valuations," described

10  above, are self-serving fabrications.  They contend that in order to allege that SST's

11  inventory was overvalued, plaintiffs must provide specific information regarding both the

12  cost and the market price of the company's products in inventory.  They argue, however,

13  that the SAC provides no information to show that the inventory was incorrectly valued –

14  much less the required detailed information concerning the market price and the cost of

15  specific inventory that plaintiffs claim should have been written down.

16        Defendants assert that the SAC does nothing to correct the deficiencies of the CAC,

17  as the SAC does not claim that Selantek had any specific data on SST's prices or costs –

18  just that Selantek based its conclusions on broad categories of data like "average selling

19  price" of "low density flash memory" in "Asia" (citing SAC ¶ 57), and that plaintiffs used this

20  generic data in order to calculate the "average unit market value" for finish flash memory

21  held in SST's inventory (citing SAC ¶ 136).  Defendants assert that the Selantek data is

22  useless for purposes of alleging falsity in the present case, as it does not include any

23  particularized information on SST's products, and does not even indicate that it included

24  SST pricing data in its generic database.

25        Defendants also contend rather than using Selantek's already broad product

26  categories – "less than 2Mb," ">2Mb up to 4Mb," and so forth, plaintiffs have combined all

27  16Mb and lower flash products, irrespective of end use or whether SST manufactures

28  them, together into a single "low density" category (citing SAC ¶ 136).  Defendants argue

21

United States District Court

For the Northern District of California

that plaintiffs improperly base all subsequent "calculations" and assertions on the inaccurate proposition that the "average pricing" in this "low density flash memory" category equals SST's inventory.  Defendants contend that the result is an artificially lowered "average selling price" because of the inclusion of wholly inapplicable categories of pricing data.

Similarly, defendants note, plaintiffs claim to have used Selantek data for "Asia," but that they have not clarified that "Asia" is not a market for which Selantek reports. According to defendants, Selantek reports for "China," "Japan," "Korea," "Asia Pacific," "US," "Rest of America," "Rest of the World," and so forth, but not for "Asia."

Defendants argue that plaintiffs' "cost" figures are equally baseless.  They claim that the term "average unit cost of inventory" is a vague construct that cannot meet the requirements of the PSLRA.  They also assert that plaintiffs incorrectly assumed, when calculating the total value of inventory by adding back the entire inventory reserve allowance,[6] that the <u>entire</u> reserve allowance relates to decline in market value, and completely ignored the allowance for excess and obsolete inventory (citing SAC ¶¶ 137, 138, 148-150).  Defendants claim that including the entire allowance in this fashion prevents the process of calculating "average unit cost" and results in a falsely inflated market price decline and generates a bogus "need" for further reserve allocation provisions (citing SAC ¶¶ 153-188).  According to defendants, without a proper calculation of all components of the inventory allowance, plaintiffs' "average" has no correlation to the actual cost of inventory.[7]

---

[6] GAAP requires that, when a company is reporting inventory value, it must provide an "allowance" or "reserve," which must include the amount by which the inventory carrying value (recorded as assets) exceeds market value (either because the inventory is excess or obsolete or because cost exceeds market value).  Any increase in such reserve must be accounted for as an expense, and charged against earnings in the "Statement of Operations."  <u>See</u> SAC ¶ 130.

[7] In the SAC, plaintiffs allege that SST's inventory allowance did not include reserves for raw materials or "work in process" because SST's manufacturing process rendered such reserves unnecessary.  They claim that until the manufacturing process with respect to a given product was "finished," SST retained the ability to convert that product (flash memory) into one with another density.  They assert that "[a]s a result, SST's allowance for excess/obsolete

United States District Court

For the Northern District of California

1   Defendants assert that plaintiffs' decision to remove the "total valuation adjustments

2   to inventory" amount from SST's inventory reserve allowance artificially understates the

3   SST inventory reserve figures so plaintiffs can then complain that the reserve is too low.

4   Defendants contend that plaintiffs incorporated all the pricing errors and distortions by

5   basing all the calculations for SST specific costs on manipulated Selantek market pricing

6   data.

7   In addition, defendants argue, plaintiffs equally apportioned the asserted $1.22

8   decline in average inventory cost across 2004 (referring to the $0.30 per quarter estimated

9   decline in inventory costs, in SAC ¶¶ 140, 158-163).  According to defendants, this

10  methodology reversal results in the improper shuffling of the December 20 write-down into

11  previous quarters.  Defendants conclude that plaintiffs are, in effect, alleging that none of

12  SST's inventory was being sold for a price greater than its cost, and that the average loss

13  SST took on every sale was more than $1.  Defendants argue that if that were the case,

14  SST would have long since gone out of business, since, based on the nearly 70 million

15  units shipped in 2Q04, SST would have lost some $83 million in that quarter alone.

16  In response, plaintiffs argue that the SAC adequately alleges that SST's prices were

17  falling throughout the proposed class period, and also alleges the amount of the

18  overstatement of inventory value.  They dispute the assertion that the Selantek data is not

19  reliable because it is not specific to SST's prices, arguing that  SST's prices were

20  equivalent to the prices of competitors as monitored by Selantek because flash memory

21  _____

22  inventory and inventory where cost exceeded market value was based almost exclusively on
    the value of finished and consigned goods held in inventory and not the value of raw materials
23  or work in process held in inventory."  SAC ¶ 131.

24  In their motion to dismiss, defendants argue the 10-Qs for the first three quarters of
    2004 clearly indicate that SST's inventory consisted of raw materials, work in process, and
25  finished goods, and that the "raw materials" and "work in process" components each were
    larger than the "finished goods" component in the majority of quarters at issue, and there is
26  therefore no basis for attributing the entire inventory reserve to finished goods.  Defendants
    also claim that SST's inventory reserves were for both lower of "cost or market" and "excess
27  and obsolete" inventory, and that SST's public filings clearly state that the inventory reserve
    included a large allowance for excess and obsolete inventory.  They note that the SAC ignores
28  the "excess and obsolete" component, treats the inventory reserve as if it consisted solely of
    lower of "cost or market," and attributes the entire reserve to finished goods.

United States District Court

For the Northern District of California

1  sold by SST was a "commodity product."  They assert that SST's prices were equivalent to

2  market prices, because competitor prices were used to set SST's prices, and because

3  SST's flash memory of a given density was in direct competition with flash memory of the

4  same density sold by competitors.

5      Plaintiffs also rely on a declaration from Jason S. Cowart, one of plaintiffs' attorneys.

6  Attached to the Cowart Declaration is an exhibit entitled "Methodology," which purports to

7  "further explain the methodology used in the . . . SAC."  Cowart states that this exhibit was

8  developed with the assistance of plaintiffs' unidentified consultants, one of whom allegedly

9  holds licenses as a CPA, a "Certified Value Advisor" and a "Certified Fraud Examiner," and

10 who allegedly has expertise in business valuations, and economic and financial analysis.

11 Plaintiffs assert that they have thereby established that defendants overstated the value of

12 SST's inventory by $3,890,000 in 1Q04 and by 2,701,000 in 2Q04.

13     Plaintiffs dispute defendants' argument that plaintiffs improperly calculated the total

14 value of inventory by adding back the entire inventory reserve allowance.  Plaintiffs argue

15 that in order to calculate inventory cost, the methodology added the stated inventory value

16 to (1) the allowance created for inventory that cost more to produce than its market value,

17 and (2) the allowance created to account for inventory that had limited market value,

18 because it was excess and obsolete.  Plaintiffs claim that in this way, the SAC was able to

19 determine the value of inventory – its cost – before any adjustment was made to account

20 for the fact that the market value of that inventory had dropped below cost.

21     Plaintiffs argue that the allowance for excess and obsolete inventory and the

22 allowance for the lower of cost or market are both designed to account for declining market

23 values, and the inclusion of both when calculating cost was entirely appropriate.  They

24 dispute defendants' argument that the inventory allowances covered raw materials, work in

25 process, and finished goods, asserting that the confidential informants confirmed that while

26 "finished goods" could not be converted into other products, "raw materials" and "work in

27 process" could be.  Thus, plaintiffs assert, declining market values had a much more direct

28 and profound effect on "finished goods" held in inventory, and the fact that the inventory

United States District Court

For the Northern District of California

1    may have also contained the other two categories of materials is of no significance.

2         Plaintiffs argue that the methodology of calculating the inventory allowance on a

3    quarterly basis was necessitated by the fact that SST did not report in specific line items,

4    on a quarterly basis, the portion of the inventory allowance that was taken to account for

5    excess and obsolete inventory, and inventory written down to the lower of cost or market.

6    Plaintiffs claim that their methodology was the only way possible to come up with the

7    inventory valuation.[8]

8         Plaintiffs maintain that the SAC adequately explains that the 1Q04 and 2Q04

9    inventory valuations were false statements because they were based on inflated market

10   value assumptions; and that it also explains that defendants' assertions about the process

11   used to value inventory were false because defendants knew they were using faulty

12   assumptions as part of that process.

13        Plaintiffs also contend that the SAC explains why the defendants' 3Q04 statements

14   were false.  Plaintiffs claim that although defendants had been forced to admit by the end

15   of 3Q04 that the average selling prices of their flash memory had declined, the SAC alleges

16   that defendants had failed to account for those declining market values when they

17   calculated the company's inventory value in the third quarter, rendering that inventory

18   valuation false.

19        The court finds that the SAC fails to state a claim with regard to SST's inventory

20   valuation, because plaintiffs fail to provide particularized information regarding the

21   relationship between the cost and market prices of specific SST products.  The Selantek

22   data is based on general market sectors, not, in this case, on SST's products, markets,

23   values, and so forth.  This generic Selantek data cannot substitute for facts regarding the

24   SST's costs and prices.  Nor can conclusory assertions that all flash memory products are

25   _____

26        [8] Plaintiffs argue that the assumptions used in the methodology were necessitated by
     the fact that SST has "refused to disclose" the proprietary information that would allow "the
27   public" to determine whether the company's inventory values were accurate.  They suggest
     that their conclusions regarding the value of SST's inventory should be taken as true because
28   defendants have offered no better way to analyze the inventory valuation, given the fact that
     SST "withheld this information from the market."

United States District Court

For the Northern District of California

1    "commodities," and that all prices are essentially the same across the entire industry,

2    substitute for particularized facts supporting the claim that defendants falsely reported the

3    value of SST's inventory in 1Q04, 2Q04, and 3Q04.

4        In addition, the court is persuaded by defendants' argument that if the SAC's

5    numbers for market prices and carrying costs were correct, SST would have sold all of its

6    products for far below cost, and sustained massive losses on all such sales.  However, the

7    SAC does not allege accounting irregularities in SST's audited financial statements, and

8    those statements show a profit of $127 million in 2004.  It is also illogical, as defendants

9    note, for plaintiffs to claim that SST dramatically increased its production in late 2004,

10   knowing that the inventory could only be sold at a fraction of production costs.

11            *b.*     *certification by Yeh and Lai that inventory was stated at lower of cost*

12                 *or market value, and in compliance with GAAP*

13       Plaintiffs allege that Yeh and Lai made false or misleading statements when they

14   certified in the 10-Qs for the first three quarters of 2004 that SST's inventory was stated at

15   the lower of cost or market value, and in compliance with GAAP.  The adequacy of this

16   allegation with regard to inventory valuation is completely dependent on the adequacy of

17   the allegation, discussed above, that defendants overstated the value of SST's inventory.

18   The court has already found that the SAC fails to allege particularized facts supporting the

19   claim that the statements regarding inventory valuation were false or misleading.

20       Moreover, with regard to both the statement regarding inventory valuations and the

21   statement regarding compliance with GAAP, the court notes that there is nothing in either

22   the 1934 Securities Exchange Act or the Sarbanes-Oxley Act and implementing regulations

23   that authorizes plaintiffs to base a claim for securities fraud on an alleged misstatement in a

24   Sarbanes-Oxley certification.

25       While some courts have held that allegations of false Sarbanes-Oxley certifications

26   may give rise to an inference of scienter, see, e.g., In re Lettice Semiconductor Corp. Sec.

27   Litig., 2006 WL 538756 (D.Or., Jan. 3, 2006) at *17-18, others have held that they do not,

28   except in limited circumstances, see Garfield v. NDC Health Corp., 466 F.3d 1255, 1265-66

**United States District Court**
For the Northern District of California

1   (11th Cir. 2006) (plain meaning of language contained in Sarbanes-Oxley Act does not

2   indicate any intent to change the requirements for pleading scienter set forth in the PSLRA;

3   Sarbanes-Oxley certification is probative of scienter only if person signing certification was

4   severely reckless in certifying accuracy of financial statements); see also In re Watchguard

5   Sec. Litig., 2006 WL 2038656 (W.D. Wash., April 21, 2006) at *9-10.  However, this court

6   has not located – nor have plaintiffs cited – any case holding that a statement in a

7   Sarbanes-Oxley certification that financial statements comply with GAAP is independently

8   actionable under § 10(b) or Rule 10b-5, as opposed to simply providing a basis for an

9   inference of scienter.

10              *c.    certification by Yeh and Lai that all statements in SST's 10-Q's were*

11                    *true*

12          Plaintiffs allege that Yeh and Lai made false or misleading statements when they

13   certified that all statements in the 10-Qs for the first three quarters of 2004 were true.

14   Plaintiffs claim that these statements were false because the statements regarding

15   inventory valuation were false.  For the reasons stated above, in the discussion of the

16   certification regarding inventory valuations and compliance with GAAP, the court finds that

17   the SAC fails to state a claim as to these statements.

18              *d.    statements that SST's selling prices were "firming" or "improving"*

19          Plaintiffs allege that the statements in the April 21, 2004, press release and

20   conference call, and in the July 21, 2004, press release, that SST's selling prices were

21   "firming" or "improving" were false when made.

22          Defendants argue that the SAC alleges no particularized facts that refute defendants

23   statements regarding selling prices in 1Q04 and 2Q04.   Defendants contend that at most,

24   the SAC alleges that a handful of "confidential informants" believed that unspecified prices

25   on unspecified products declined at unspecified times in the years following 2002.

26   Defendants contend that this is insufficient to plead falsity under the PSLRA.

27          Plaintiffs allege, based on information obtained from various "confidential

28   informants," that participants at meetings held during 1Q04 and 2Q04 discussed the fact

United States District Court

For the Northern District of California

1   that SST's prices were falling.  However, the SAC does not identify any of SST's more than

2   90 products and provides no information regarding the price at which any particular product

3   was sold at any particular time.

4        Instead, plaintiffs rely instead on the generic industry data obtained from Selantek.

5   As discussed above with regard to the inventory valuations, however, the Selantek data is

6   not based on any information regarding SST's prices.  Moreover, it classifies products in

7   broad, irrelevant categories such as "less than 2Mb," ">2Mb up to 4Mb," and so forth; large

8   geographic regions such as "China," "Europe," and "Rest of the World" (but not "Asia"); and

9   for each category and region, provides only general average prices rather than product-

10  specific information.

11       Plaintiffs assert that CI ## 3, 13, and 16 all stated that flash memory products,

12  including those manufactured by SST, are "commodity products," and that products of the

13  same densities are generally priced the same.  SAC ¶ 40.  They also claim that CI ## 2 and

14  13 stated that SST's products shared the same market as products of the same density

15  manufactured by the SST's competitors.  SAC ¶ 41.  However, none of these "confidential

16  informants" worked at SST during the proposed class period, and plaintiffs do not allege

17  facts sufficient to "support the probability that a person in the position occupied by the

18  [confidential] source would possess the information alleged."  Nursing Home Pension Fund,

19  Local 144 v. Oracle Corp., 380 F.3d 1226, 1233 (9th Cir. 2004).

20       CI # 2 worked at SST until August 2002 as a "inventory control analyst" who tracked

21  inventory and received inventory shipments, and then until June 2003 as a "document

22  control specialist" who analyzed and reviewed internal documents, including documents

23  regarding inventory.  SAC ¶ 33(b).  CI #3 worked at SST through 2000 as a "production

24  control manager" who managed offshore test houses and developed forecasts that

25  corresponded with inventory goals, and then until June 2003 as a "senior business planner"

26  who tracked shipments of flash memory products.  SAC ¶ 33(c).  CI # 13 worked at SST

27  through March 2003 as a "regional sales director" who was responsible for selling SST

28  products to customers on the East Coast of the U.S. and in Canada.  SAC ¶ 33(m).  CI #

28

United States District Court
For the Northern District of California

16 was Vice President of North American sales from 2000 through September 2003.  SAC ¶ 33(p).  Plaintiffs allege no facts showing that CI ## 2 and 3, each of whom left SST in June 2003, or that CI #13, who left SST in March 2003, or that CI # 16, who left SST in September 2003, possessed any knowledge about SST's costs or prices during the proposed class period, or was qualified to state authoritatively that SST's products were essentially fungible "commodities."

The court finds that the Selantek data – consisting of generic averages across uncounted products through vague geographic areas – provides insufficient support for the allegations that SST's prices were falling, or even that the prices of products identical to those manufactured and sold by SST were falling in the same geographical area where SST was selling its products.  In short, for the reasons discussed above with regard to the inventory valuations, the Selantek data does not support the claim that SST's prices were falling throughout the class period.

Plaintiffs also assert that the 1Q04 and 2Q04 statements were false when made based on the claim that numerous "confidential informants" observed that SST's prices were falling.  The court finds, however, that the allegations of complaints by SST employees at sales meetings is too vague and nondescript to provide support for a claim that the prices for SST's products were falling.  The sole support for this assertion in the SAC is statements from eight individuals (CI ## 6, 7, 8, 10, 14, 15, 16, and 17).  However, with the possible exception of CI # 17, none of these informants appear to have occupied positions at SST during the relevant period that would have provided them with personal knowledge of the sales prices or market value of SST's products.

CI # 6's duties consisted primarily of allocating commissions for SST sales representatives.  SAC ¶¶ 33(f), 64.  CI # 6 is not alleged to have been involved in any aspect of SST's process of determining individual product prices or costs.

CI # 7 worked in SST's IT Department, in which capacity he/she helped maintain the technical functionality of SST's various software systems.  SAC ¶ 33(g).  He/she was responsible for ensuring that the databases worked properly, but the SAC does not allege

United States District Court

For the Northern District of California

1   that this informant had any input into the data or even any independent knowledge or

2   understanding of the information the databases contained.

3        CI # 8 was a "senior operations planner," who tracked raw materials and finished

4   goods.  SAC ¶ 33(h).  He/she "received sales forecasts from the business unit managers,"

5   and attended planning meetings and sales meetings.  Id.  The SAC does not allege that

6   this informant had any specific knowledge of sales prices of all of SST's products.

7        CI # 10 was a "cost-account manager" who worked at SST only through April 2004.

8   He/she was "involved in inventory valuation."  He/she met with Yeh and Hu regularly to

9   "review inventory cost numbers, and met with "the controller and three business unit

10  directors" monthly to discuss "inventory costs and market prices.  SAC ¶ 33(j).  However,

11  CI # 10 is alleged to have said only that "products, including the 16-megabit flash products,

12  were sold at below cost."  SAC ¶ 68.  There is no allegation that CI # 10 said that prices of

13  all SST's products were falling throughout the class period, or that he/she had any specific

14  information regarding any specific SST products at any specific point in time.

15       CI # 14 was Senior Sales Director of Asia Pacific North, but worked at SST only until

16  June 2003.  SAC ¶ 33(n).  CI # 16 was VP of North American sales, until September 2003.

17  SAC ¶ 33(p).  They are both alleged to have stated that the prices of SST's "flash memory

18  products" fell from 2001 levels during the time they were working at the company.  SAC

19  ¶ 69.  However, this allegation cannot be used to support a claim that SST's prices were

20  falling during the class period.

21       CI # 15 was a "product engineer" who reported to the director of product

22  engineering.  He/she tested finished products and first-runs of engineering materials

23  received at SST from product fabricators.  SAC ¶ 33(o).  He/she stated that he was asked

24  to "speed up the testing process" at some point during the period of 2002 through 2004

25  because "prices were going down."  SAC ¶ 70.  This allegation does not provide

26  particularized support for the allegation that defendants falsely stated that prices were

27  "firming" or "improving" during 1Q04 and 2Q04.

28       CI # 17 worked at SST from 1999 through the end of the class period, in the

United States District Court

For the Northern District of California

1   "segment marketing group."  In that capacity, he/she was responsible for "quoting and

2   negotiating prices to customers."  SAC ¶ 33(q).  According to plaintiffs, CI # 17 stated that

3   "prices dropped dramatically at [SST] and across the industry" throughout the class period,

4   because of a "decrease in demand."  SAC ¶ 66.  This allegation might provide weak

5   support for plaintiffs' general claim that SST's prices were falling during the class period,

6   except for the fact that it is contradicted by the allegations in SAC ¶¶ 73-74, where plaintiffs

7   allege that SST's competitors' prices were falling and that Best refused to allow SST's

8   products to be sold below a certain level.

9        A further problem is that the SAC routinely mixes up allegations regarding SST's

10  prices with allegations regarding industry prices.  Plaintiffs allege that the individual

11  defendants falsely stated that SST's prices were "firming" or that SST's average selling

12  prices were improving, and that Hu set SST's prices.  There is no allegation, however, that

13  SST's prices were actually lower than Hu's mandatory minimum (the level below which he

14  allegedly instructed SST's employees that SST's prices could not drop).  At most, the SAC

15  alleges that Hu was negligent for insisting on maintaining the higher sales prices in the face

16  of falling industry prices.  To state a claim for misrepresentation, plaintiffs would have to

17  allege particularized facts indicating that SST's prices were falling at a time when

18  defendants were publicly stating that the prices were "firming" or "improving."  But there are

19  no such facts pled in the SAC.

20             e.    statement by Lai that "we should be okay"

21        During the October 20, 2004, conference call, Lai stated, in response to a question

22  about inventory, "The inventory increase actually is primarily due to the 8-meg because 8-

23  meg are the sales in Q2 was very high, and that Q3 actually have drop in sales for 8-meg

24  products so we build up inventory primarily due to the 8-meg products."  An analyst for C.E.

25  Unterberg, Towbin then asked, "And how confident are you that you won't have to take a

26  write-down, and will you be able to sell this 8-meg inventory in Q-4?"  To this, Lai

27  responded, "For 8-meg products we are doing very well in terms of production and the

28  ramp up's primarily at Grace at a cost structure is still very, very good, and also we are now

31

1   using that capacity actually to produce 16 and 32 so that our costs at this moment still look

2   okay.  There's not too much OCM consideration at this moment so we should be okay."

3       Defendants argue that plaintiffs cannot state a claim with regard to Lai's statement

4   because it was made in response to a question during a conference call.  Defendants also

5   assert that plaintiffs have improperly characterized the statement "we should be okay" –

6   which defendants assert is at most an inactionable statement of corporate optimism – as

7   meaning "no 4Q04 write-down will be necessary."

8       Plaintiffs, however, assert that Lai's statement was false because he was asked

9   during 4Q04 whether SST would need to take a write-down, and 4Q04 was when the write-

10  down was taken.  They also claim that Lai was well aware from CI #18 that the inventory

11  reserve was too low.

12      Projections and general statements of optimism may trigger liability under Rule

13  10b-5.  In re Apple Computer Sec. Litig., 886 F.2d 1109, 1113 (9th Cir. 1989).  A statement

14  of optimism contains at least three implicit factual assertions: (1) that the statement was

15  genuinely believed by the person making it; (2) that there was a reasonable basis for the

16  statement; and (3) that the speaker was not aware of any undisclosed facts tending to

17  seriously undermine the accuracy of the statement.  Id.  Such statements are actionable

18  under Rule 10b-5 to the extent that one of these implied factual assertions was inaccurate.

19  Id.

20      However, courts have routinely held that vague or amorphous statements of

21  optimism and "puffing" about a company or a product are not actionable.  See, e.g., In re

22  Stratosphere Corp. Sec. Litig., 66 F. Supp. 2d 1182, 1197-99 (D. Nev. 1999); Wenger v.

23  Lumisys, Inc., 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998); In re Gupta Corp. Sec. Litig., 900

24  F. Supp. 1217, 1236 (N.D. Cal. 1994).  "Statements that fall within the rule tend to use

25  terms that are not measurable and not tethered to facts that a reasonable person would

26  deem important to a securities investment decision."  In re Ligand Pharms., Inc. Sec. Litig.,

27  2005 WL 2461151, at *19 (S.D. Cal., Sept. 27, 2005) (citation and quotation omitted).

28  Such vague statements cannot be said to "have been viewed by the reasonable investor as

32

United States District Court

For the Northern District of California

1   having significantly altered the 'total mix' of information made available."  TSC Indus., Inc.

2   v. Northway, Inc., 426 U.S. 438, 449 (1976) (citation omitted).

3   In this case, the statement of opinion, "we should be okay," is too vague and

4   amorphous to provide any reasonable investor with a basis for making an investment

5   decision.  In addition, plaintiffs plead no facts showing that Lai's opinion was not believed at

6   the time he expressed it, and do not assert that anyone told Lai anything about inventory

7   reserves.  Plaintiffs allege that CI # 18 "had responsibility for calculating preliminary

8   inventory reserves for submission to Lai" during 3Q04, and that CI # 18 stated that he/she

9   "calculated that a 'substantial' inventory reserve of about $30-40 million was necessary."

10  SAC ¶ 226.  As defendants note, however, plaintiffs do not allege that CI # 18 actually

11  communicated his preliminary reserve to Lai or to any defendant.  Moreover, to the extent

12  that the quoted exchange between Lai and the analyst is clear, the transcript suggests that

13  the reason Lai said SST should be "okay" was based on his assessment that the ramp-up

14  of production of 8mg products was "at a cost structure [that] is still very, very good."

15      2.    Scienter

16  In the order dismissing the CAC, the court found that plaintiffs had failed to allege

17  particularized facts showing that defendants acted with knowledge or deliberate

18  recklessness.  In the SAC, plaintiffs assert that defendants knew or should have known that

19  "prices" were declining throughout the class period, for four reasons.  Plaintiffs allege that

20  defendants were actively involved in monitoring and establishing SST's product pricing

21  during 2004; that the decline in SST's prices was discussed in meetings that defendants

22  attended; that defendants took steps that demonstrated their awareness that SST's prices

23  were falling; and that employees in the sales and marketing groups talked openly about the

24  fact that Hu's "price mark-ups" did not reflect market prices.  SAC ¶¶ 71-75.

25  Plaintiffs assert further that defendants' reckless or intentional conduct with regard to

26  inventory valuation is shown by three additional facts – that defendants controlled the

27  inventory valuation process; that defendants were specifically told that the inventory

28  needed to be written down during the class period; and that defendants established internal

**United States District Court**
For the Northern District of California

1   controls that ensured that there would be no proper oversight regarding inventory valuation.

2   SAC ¶¶ 192-238.

3   　　　Under the PSLRA, whether alleging that a defendant "made an untrue statement of

4   material fact" or alleging that a defendant "omitted to state a material fact," the complaint

5   must, with respect to each alleged act or omission, "state with particularity facts giving rise

6   to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.

7   § 78u-4(b)(2). In the Ninth Circuit, the required state of mind is "deliberate or conscious

8   recklessness." In re Silicon Graphics, 183 F.3d at 979. Mere motive and opportunity are

9   not enough. Id. Because falsity and scienter in securities fraud cases may be inferred

10  from the same set of facts, the Ninth Circuit frequently incorporates the falsity and scienter

11  requirements into a single inquiry. See America West, 320 F.3d at 932.

12  　　　On a Rule 12(b)(6) motion to dismiss a complaint brought under the PSLRA, when

13  considering whether plaintiffs have shown a strong inference of scienter, "the district court

14  must consider all reasonable inferences to be drawn from the allegations, including

15  inferences unfavorable to the plaintiffs." Gompper, 298 F.3d at 897 (also noting tension

16  between customary latitude granted plaintiff on a Rule 12(b)(6) motion to dismiss and

17  heightened pleading standard set forth under the PSLRA). In other words, the court must

18  consider all the allegations in their entirety in concluding whether, on balance, the

19  complaint gives rise to the requisite inference of scienter. Id.

20  　　　Defendants argue that plaintiffs have failed to allege particularized facts establishing

21  a strong inference of scienter. They assert that the SAC does not allege that any of the

22  confidential informants reported that any defendant ever stated that SST's inventory

23  valuations were false; or that any document, database, or report confirmed that the

24  valuations were false. In addition, they contend that plaintiffs do not allege that any

25  defendant made, wrote, read, or heard any contemporaneous statement that specifically

26  contradicted any of SST's inventory valuations, financial statements, or any other statement

27  that plaintiffs now claim was false. Defendants argue that at most, plaintiffs allege

28  corporate mismanagement, negligence, or overly optimistic business judgment – not

United States District Court

For the Northern District of California

1    actionable securities fraud – as the court previously found in the order dismissing the CAC.

2                    a.    *defendants' alleged involvement in monitoring and establishing SST's*

3                          *product prices during 2004*

4          Plaintiffs assert that CI ## 13, 14, and 16 had information regarding Hu's and Yeh's

5    involvement in setting prices in 2003, before the commencement of the class period.  SAC

6    ¶ 72(c)-(e).  Plaintiffs also claim that "a number of former employees" confirmed that

7    defendants were actively involved in establishing SST's product prices in 2004.  SAC ¶ 72.

8    According to CI #7, Hu determined price margins and maintained pricing information, and

9    had the final say in determining product prices during the proposed class period.  SAC

10   ¶ 72(a).  Plaintiffs claim that "any price quote below segment marketing price required

11   approval from the segment marketing group," and "[a]ny price quote below the business

12   unit's mark up price required approval from the business unit group."  SAC ¶ 72(b).

13         Plaintiffs allege that CI # 7 also stated that SST had a "structure" whereby Yeh's

14   authorization was required if a sales person intended to quote a price below cost, and that

15   30% of all product sold in 2004 was sold below Hu's prices and required approval.  SAC

16   ¶ 72(b).  CI # 7 was aware of this "structure" because it implemented the "EFlash" system.

17   Id.  The "EFlash" database was a "pre-sales automated system that automated [SST's]

18   pricing process and showed [SST] prices offered to customers."  SAC ¶ 38(e).  It had 12

19   "modules," and SST primarily used two of those – the "Request for Quotes" or "RFQ"

20   module, and the "Price Guideline applications" module.  Id.  Plaintiffs claim that the "Price

21   Guideline applications" system "fed the pricing structures accessed by the RFQ system,

22   and that CI ## 7 and 16 both reported that Yeh and Hu had access to the RFQ system.  Id.

23   According to CI #7, the "E-Flash" system automatically sent e-mails to the appropriate

24   department for approvals when a price quote fell below specific levels.  SAC ¶ 72(b).

25         These allegations do not support plaintiffs' claim that defendants made false and

26   misleading statements with either knowledge or deliberate recklessness.  At most, they

27   establish that Hu and Yeh had knowledge of SST's product prices.  Hu was SST's Chief

28   Operating Officer, and Yeh was the company's Chief Executive Officer in 2004.  It is not

United States District Court

For the Northern District of California

1    surprising that they may have been involved in monitoring and establishing SST's product

2    prices during that period.

3            *b.    discussion of prices of SST's products at meetings attended by*

4                   *defendants*

5            Plaintiffs assert that "declining prices" were specifically discussed at sales meetings

6    by the individual defendants.  According to CI # 7, SST's "product prices" started to fall in

7    2002 and continued to fall throughout 2004, and SST's sales force raised concerns about

8    falling market prices at the April 2004 sales meeting.  SAC ¶¶ 65, 73(a).  CI # 6 is alleged

9    to have stated that declining market prices were discussed at the January and April 2004

10   quarterly sales meetings.  SAC ¶ 73(b).  Plaintiffs contend that these allegations show that

11   SST's prices were falling during the proposed class period, and that defendants were

12   aware that the prices were falling.

13           Those sections of the SAC do not, however, support plaintiffs' claims.  In SAC

14   ¶ 73(a), plaintiffs allege that sales and marketing personnel "complained that market prices

15   were falling" in April 2004, and "continued to raise concerns about falling [market] prices" in

16   August 2004.  SAC ¶ 65 alleges that SST's prices "fell in Asia during 2004 in order for

17   [SST] to compete with its competitors' prices," but this allegation conflicts with the claims in

18   SAC ¶ 73 that in January and April 2004, "the U.S. market was being driven down and

19   prices were falling such that [SST] 'couldn't compete anymore' with Asian prices."  While

20   discussion of SST's sales prices would not have been at all unusual in the context of an

21   SST sales meeting, the focus of the "discussions" among the unidentified SST employees,

22   as reported by plaintiffs in the SAC, appears to have been on declining <u>market</u> prices, and

23   the impact of those declining prices on SST's business.

24           *c.    steps taken by defendants which demonstrated their awareness that*

25                  *prices were falling*

26           Plaintiffs claim that defendants took certain steps that demonstrated their awareness

27   that "prices" were falling.  Plaintiffs assert that, according to CI # 6, Best set a "Minimum

28   Price" list in 1Q04.  Plaintiffs describe the "Minimum Price" list as an Excel spreadsheet that

contained all of SST's products and prices worldwide.  SAC ¶ 74(a).  The data in the

"Minimum Price" list was allegedly compiled by Best, who distributed the list to all sales

representatives and sales staff via e-mail.  SAC ¶ 38(p).  It was also given to accounting

staff. SAC ¶ 74(a).

Best allegedly advised the sales force that if they sold products at prices below

those on the list, they would receive lower commissions.  SAC ¶ 74(a).  According to CI

# 6, this was the first time Best or any executive had done this.  CI # 6 stated further that,

there was pressure at the January and April 2004 quarterly meetings to keep prices at a

certain level;" and that, other than Best, no one at the January and April 2004 quarterly

meetings expressed the view that prices were going up.  SAC ¶ 74(b).

Again, these allegations do not indicate an awareness on defendants' part that

SST's prices were falling.  The sales meeting at which this subject was allegedly discussed

was the meeting at which Best, the VP of Sales and Marketing, stated that prices were

increasing.  See SAC ¶¶ 73(b), 74(b).  Even if the SAC alleged that there were discussions

of declining prices on specific products or in specific densities of memory at the meetings –

which it does not – the fact that Best, alleged to have had first-hand knowledge of the

prices at issue, expressed a contrary view negates any suggestion of fraud.

> *d.*     *employees' discussions of Hu's "mark-ups"*

Plaintiffs allege that according to CI # 7, the "sales and marketing groups" talked

openly about how Hu's internal mark-ups "did not reflect market prices, which were lower."

SAC ¶ 75.  This allegation, which basically consists of hearsay and innuendo, does not

support plaintiffs' claim that defendants made false statements about SST's prices and

inventory values with knowledge or deliberate recklessness.

> *e.*     *defendants' control of inventory valuation process*

Plaintiffs assert that in addition to knowing that prices were falling in 2004,

defendants also controlled the inventory valuation process, as shown by the facts (i) that

defendants set the "price assumptions" that were used in valuing inventory; (ii) that Hu set

the cost assumptions that were used in valuing inventory; (iii) that defendants set the

United States District Court

For the Northern District of California

reported inventory values; and (iv) that defendants manipulated SST's inventory control system.

First, plaintiffs allege that defendants set the "price assumptions" that were used in valuing inventory. SAC ¶¶ 193-196. They assert that according to CI # 2, the finance department was excluded from final pricing determinations through at least June 2003, and Hu told the cost accountants what prices to use for the products – regardless of actual prices – when valuing inventory. According to CI # 2, Hu's prices were "arbitrary." SAC ¶ 196. This allegation, by an informant who left SST in 2003, does not create a strong inference of scienter with regard to statements made during the proposed class period.

Second, plaintiffs assert that Hu set the "cost assumptions" that were used in valuing inventory. SAC ¶¶ 197-202. They allege that CI # 10 stated that, prior to the proposed class period, Hu assigned cost figures for each SST product for the purpose of valuing inventory, and that these costs were set based on Hu's "personal discussions with vendors." SAC ¶ 198.

SST's "Oracle ERP" database was allegedly designed to track inventory, and contained information regarding inventory cost, purchase and sale data, costs, and raw material data. SAC ¶¶ 38(b). Plaintiffs assert that numerous employees at SST had access to the "Oracle ERP" system – some of whom worked at SST during the proposed class period, and some of whom did not. Id. Plaintiffs claim that, according to CI # 7, the "costs" listed in this database were not accurate because Hu turned off the "auto updates for costs in the implementation phase," SAC ¶¶ 197, 200; and that according to CI ## 1 and 7, Hu "maintained his own Excel inventory reports to track inventory, costs, and prices," SAC ¶¶ 38(c), 200. Plaintiffs claim that Hu set cost figures for each SST product based on his personal discussions with vendors, and that he used those costs to calculate inventory. SAC ¶¶ 198-199. Plaintiffs assert that "very few employees outside of Hu had access to these Excel spreadsheets." SAC ¶ 38(c). According to CI # 7, "costs were a mystery; only Yaw Wen [Hu] knows." SAC ¶ 200. CI # 7 also reportedly stated that Lai reviewed Hu's Excel spreadsheets. SAC ¶ 210.

United States District Court

For the Northern District of California

1    According to CI # 7, SST's "Oracle ERP" database required that a cost figure be

2  input into the system in order to produce bills of materials that were used to produce SST's

3  products, but Hu used "dummy costs" for entry "in the system," which were "derived from

4  his personal conversations with [SST's] vendors and tracked on his personal Excel

5  spreadsheet."  SAC ¶ 199.  CI # 16 – the VP of North American sales between 2000 and

6  2003, well before the proposed class period – claimed that he was "denied full access" to

7  SST's cost figures.  SAC ¶ 202.

8    The claim that Hu kept a "secret" spreadsheet that was used to override SST's

9  "official" databases is attributed primarily to CI # 7, described as a "senior business-

10  systems analyst in the IT department throughout the entire Class Period," who reported to

11  Chi Yin, VP of IT and Global Communication.  SAC ¶ 33(g).  CI # 7 is alleged to have

12  worked as "a lead designer for the corporate data warehouse projects in 2003 and 2004,"

13  who "designed packages to extract, transform, and load data from Oracle ERP."  Id.

14  Plaintiffs do not allege, however, that CI # 7 played any role in the determination of

15  inventory values, or SST's accounting or finance functions, even in operations.  The

16  statements by CI # 7 therefore do not provide strong support for this claim, because

17  plaintiffs do not plead particularized facts showing that CI # 7 was familiar with the contents

18  of the alleged secret database.

19    Moreover, the allegations in the SAC regarding "Hu's Excel" spreadsheet are

20  contradictory, as it is not possible that Hu kept the spreadsheets "secret" from employees,

21  as plaintiffs claim, and that the spreadsheets and their contents were also "talked about

22  openly" throughout the sales and marketing departments, as plaintiffs also claim.  In

23  addition, the same defendants who supposedly used the "secret" spreadsheets to inflate

24  SST's stock price – Yeh, Hu, Lai, and Best – lost millions by purchasing stock and retaining

25  their holdings in SST.  This is the opposite result that one would expect from defendants

26  who were privy to secret adverse information.

27    Third, plaintiffs assert that defendants set the "reported inventory values."  SAC

28  ¶¶ 203-211.  According to CI ## 1, 2, 3, 4, and 19, Hu and Yeh maintained and exercised

1    total control over the final inventory values, to the exclusion of the finance and accounting

2    groups.  SAC ¶ 203.  CI # 1 stated that Yeh and Hu were very "hands-on in terms of

3    running the company," that they "called all the shots;" and that "other people down the

4    chain did not have much of a say" regarding valuation of inventory.  SAC ¶ 206.  CI # 3

5    stated that Yeh and Hu made the final valuation decisions through at least mid-2003.  CI

6    # 4 stated that while the accounting department assigned initial dollar value to SST's

7    products, the final figures were determined by Yeh and the CFO.  SAC ¶ 205.  CI # 4 also

8    stated that, at least through 2Q03, Yeh, Hu, and "the VPs" looked at the inventory numbers

9    "very, very carefully."  SAC ¶ 207.  CI # 14 described Yeh as "the ultimate decision-maker

10   with regard to inventory values" in 2003.  SAC ¶ 211.  CI # 19, SST's former controller,

11   stated that his/her group did not value the inventory.  SAC ¶ 204.

12        The statements from these "confidential informants" are vague and conclusory, and

13   contain no details about specific products or specific prices.  In addition, as repeatedly

14   noted above, many of the informants ceased working at SST well before the class period

15   began.  The only informants who were at SST during the class period do not add sufficient

16   particularized information to plaintiffs' allegations of scienter.  For example, CI #19, SST's

17   Controller, who allegedly stated that Hu and Yeh maintained total control over inventory

18   during the proposed class period, to the exclusion of the finance and accounting group,

19   would certainly have known about a fraud if there had been one.  However, CI # 19 is cited

20   only as having access to the "Oracle ERP" database, SAC ¶ 38(b), as opining that Lai was

21   not qualified to act as CFO, SAC ¶ 231, and as stating that Hu and Yeh controlled

22   inventory, SAC ¶ 203-204, but not as saying anything substantive in connection with any

23   alleged fraud at SST.

24        Fourth, plaintiffs assert that defendants did not have an adequate system for

25   managing SST's inventory, and that they "manipulated" the inventory control system.  SAC

26   ¶¶ 212-223.  CI # 12 stated that SST did not have global standards for reporting inventory

27   during the proposed class period, and there was a lot of uncertainty about what was in the

28   inventory.  SAC ¶ 217.  CI ## 1 and 13 stated that SST had a "poor system for managing

40

United States District Court

For the Northern District of California

1   and monitoring its inventory," and "could never tell where parts were, how many [they] had,

2   what status they were." SAC. ¶ 218.  CI ## 7, 9, and 16 commented about SST's lack of a

3   centralized inventory system.

4        CI # 1 claims that several employees told Hu and Yeh prior to the class period that

5   Hu's inventory figures did not reflect the figures in the "Oracle ERP" database, but that Yeh

6   and Hu refused to accept the information contained in the "Oracle ERP" database.  SAC

7   ¶ 214.  Plaintiffs allege that when defendants were informed that Hu's values were

8   inconsistent with information contained in SST's "Oracle ERP" database, they instructed

9   employees to adjust the company's official figures to reflect Hu's inventory levels and

10  values.  SAC ¶¶ 214-215.  CI # 7 stated that those adjustments continued throughout 2004.

11       Plaintiffs also claim that defendants manipulated the inventory values by

12  "prevent[ing] the complete integration of the EFlash system."  SAC ¶ 216.  According to CI

13  # 7, he/she and other IT staff attempted to automate the RFQ system in 2004, but they

14  were "specifically told" that the EFlash system should not be implemented "at Yah Wen's

15  level," and were "instructed" to stop the integration at the business unit level.  Id.  According

16  to plaintiffs, "this meant that [SST's] pricing system would not be integrated with [its] vendor

17  systems because Hu spoke with vendors and maintained the vendor data concerning

18  costs."  Id.  Plaintiffs claim that if the system had been fully integrated with cost

19  information from the vendor system, "the prices could have been adjusted according to cost

20  fluctuations."  Id.

21       The allegations relating to inventory management prior to the class period do not

22  show defendants' scienter with regard to statements made during the class period.  The

23  statements regarding the alleged "adjustments" and the "EFlash" database are conclusory

24  and vague, as they do not state who informed defendants that Hu's values were

25  inconsistent with information in the "Oracle ERP" database, or which employees were

26  instructed to adjust the official figures; and do not specify a single SST product or an exact

27  time period.  Thus, these allegations do not provide direct, particularized support for the

28  claim that defendants acted with conscious or deliberate recklessness.

41

United States District Court

For the Northern District of California

1

      *f.*    *defendants' awareness that inventory need to be written down*

2

    Plaintiffs assert that defendants were specifically told that the inventory needed to be

3

written down during the class period.  Plaintiffs allege that CI # 7 stated that the need to

4

write down two or three product lines due to excess inventory was specifically discussed

5

during the quarterly management meetings in late 2003 and 2004, and that at some point in

6

2004, "they" discussed the excess inventory and the need to sell inventory at below cost.

7

SAC ¶ 224(a).  Plaintiffs also allege that CI ## 1, 2, 3, 4, 9, 12, 16, and 18 reported

8

discussions, in one form or another, regarding the need to write down inventory.  SAC

9

¶¶ 224(b), 225, 227, 228.

10

    The allegations based on statements by CI # 7 are too vague and conclusory to

11

provide support for plaintiffs' claim that defendants knew that inventory needed to be

12

written down before it was.  According to the SAC, the quarterly management meetings

13

were attended by 70 to 80 managers, as well as most marketing and sales staff.  SAC

14

¶ 39(c).  However, plaintiffs do not say when the meeting or meetings described by CI # 7

15

were held, do not say who made the statement that two or three product lines needed to be

16

written down, and do not say who discussed excess inventory or the need to sell below

17

cost.

18

    The allegations based on statements by the other listed "confidential informants" are

19

either irrelevant (as to CI ## 1, 2, 3, 4, and 16, who had all left SST before the beginning of

20

the class period), or are vague and conclusory (as to CI ## 9 and 12, who are alleged to

21

have "recalled that Thiemer warned management about the need to write down excess

22

inventory and defective products," without saying when this occurred, which products were

23

at issue, or which members of "management" were warned).

24

    The allegation that CI # 18 stated that he/she had calculated that a "substantial"

25

preliminary inventory reserve of $40-50 million was necessary, SAC ¶ 226, does not

26

support the claim that defendants knew that the inventory needed to be written down during

27

the class period.  Plaintiffs do not allege that CI # 18 ever told anyone anything about the

28

reserve.  Moreover, even if the SAC alleged facts regarding the supposed $30-40 million

United States District Court

For the Northern District of California

1   estimate, a statement about a "preliminary" inventory reserve is speculative insofar as any

2   final reserve is concerned.

3          *g.*     *defendants' establishment of internal controls with no proper oversight*

4          Plaintiffs allege that defendants established the internal controls in order to ensure

5   that there would be no proper scrutiny of their actions regarding inventory valuation.  SAC

6   ¶¶ 229-238.  Plaintiffs claim that the fact that Best, Hu, and Yeh controlled the inventory

7   valuation process, but were trained in engineering and not in accounting or finance, shows

8   that defendants acted with deliberate recklessness.  SAC ¶ 229.  Plaintiffs assert that by

9   giving "unqualified" people the authority to make, approve, and review determinations

10  regarding inventory valuations, defendants established a process with no oversight.  SAC

11  ¶ 230.

12         Plaintiffs allege that "numerous employees," including CI ## 6 and 19, stated that

13  they did not believe Lai was qualified to act as the company's CFO, and suggest that the

14  fact that SST announced in April 2005 that it was replacing Lai shows that Lai was

15  unqualified.  SAC ¶ 231.  Plaintiffs also assert that none of the members of the Audit

16  Committee had an accounting background or was a "financial expert."  SAC ¶¶ 233.

17         Plaintiffs allege that CI # 2 stated that the company lacked a VP of Quality

18  Assurance prior to June 2003; that CI # 16 – who left SST in September 2003 – stated that

19  he/she did not receive data necessary to calculate commissions for the sales force; and

20  that CI # 6 – a marketing director until October 2004 – claimed he/she was not permitted

21  access to general pricing information for sales to Asia.  SAC ¶ 235, 237.

22         These allegations do not support plaintiffs claims that defendants made false

23  statements knowingly or with deliberate recklessness.  At most, the claims that the

24  individual defendants lacked the education or training to make financial decisions might

25  establish corporate mismanagement or negligence.

26         For all the reasons discussed above, plaintiffs' allegations are insufficient to

27  establish that defendants made false or misleading statements with the requisite state of

28  mind.  Aside from the individual allegations, the court considers "whether the total of

plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1038 (9th Cir. 2002).  When considered together in their entirety, defendants' allegations remain insufficient.[9]  The court finds that plaintiffs have failed to plead facts sufficient to raise a strong inference that defendants made false or misleading statements with knowledge of their falsity or with deliberate recklessness.

---

[9]   The SAC contains additional allegations, not specifically pled as creating a strong inference of scienter,  that might nonetheless be interpreted as bearing on scienter.  Plaintiffs assert, for example, that "several company insiders took advantage of their knowledge" that the stock price was going to decline when the company "revealed the truth about the value of its inventory." SAC ¶ 111.  However, only outside director Isao Nojima and Senior VP Yasushi Chikamagi are alleged to have sold their stock during the proposed class period.  Neither Nojima nor Chikamagi is a defendant in this action, and neither is  alleged to have  made any of the allegedly false and misleading statements.  See In re Silicon Graphics, 183 F.3d at 988 (finding no inference of scienter, in part, because Senior VP who sold stock did not make any of allegedly misleading statements).  On the other hand, the defendants who are alleged to have made false and misleading statements sold no stock during the proposed class period, and appear to have suffered significant losses (based on the decline in the value of SST's stock).  Hu and Lai even purchased stock at prices that plaintiffs claim was inflated by their own fraud.  Thus, the sale of stock by the two outsiders does not give rise to a strong inference of deliberate recklessness.

   In the allegations of Q304 false and misleading statements, plaintiffs refer to SST's acquisition of G-Plus, although they do not allege that this business transaction reflects defendants' scienter.  See SAC ¶ 100.  In any event, the court previously found in the order dismissing the CAC that the G-Plus acquisition was "an example of the type of routine activity and generic motive that cannot serve as a basis for alleged securities fraud."  Similarly, the reference in the SAC to the Sarbanes-Oxley 404 statement in SST's 2004 10-K regarding internal control "deficiencies" that "could" result in future financial statement inaccuracies, see SAC ¶¶ 123, 125, does not support the allegations of scienter, and the court previously so ruled.

   Finally, the SAC alleges under "Additional Falsity Allegations" that defendants violated various provisions of GAAP.  SAC ¶¶ 189-191.  While allegations of GAAP violations may support a claim for securities fraud, a general allegation that the practices at issue resulted in a GAAP violation is not a sufficiently particular claim of misrepresentation.  See In re Daou, 411 F.3d at 1016.  Here, other than the claim that defendants failed to state inventory as the lesser of cost or market value, plaintiffs allege no facts tied specifically to any asserted GAAP violation.  Moreover, to the extent that plaintiffs intend to plead fraudulent intent based on GAAP violations, they must allege facts showing (1) that specific accounting decisions were improper, and (2) that defendants knew specific facts at the time that rendered their accounting determinations fraudulent.  DSAM, 288 F.3d at 390-91; In re Software Toolworks Inc., 50 F.3d 615, 627-28 (9th Cir. 1994).  For the reasons previously stated in the order dismissing the CAC, the court finds that plaintiffs' allegations of GAAP violations do not give rise to a strong inference of deliberate recklessness.

**United States District Court**
For the Northern District of California

1          3.      Control Person Liability

2          Defendants argue that the § 20 claims must be dismissed because plaintiffs have

3   failed to state a claim of primary liability.  The court finds that the § 20 claim must be

4   dismissed, for the reason stated by defendants.  See In re VeriFone Sec. Litig., 11 F.3d

5   865, 872 (9th Cir. 1993).

6   C.     Request for Judicial Notice

7          Defendants submitted a request that the court take judicial notice of certain

8   documents filed by SST with the SEC, as well as the company's press releases,

9   conference call transcripts, audit opinions, and stock prices.

10         Plaintiffs do not oppose the court taking judicial notice of the existence of these

11  documents, but object that the request is improper to the extent that defendants seek to

12  have the court take judicial notice of the truth of the contents of the documents, based

13  merely on the existence of the documents.

14         The objections are OVERRULED, as the court has not relied on any of the disputed

15  material in reaching a decision in the present motion.

16  D.     Leave to Amend

17         Dismissal without leave to amend is improper unless it is clear that the complaint

18  could not be saved by any amendment.  See Gompper, 298 F.3d at 898 (9th Cir. 2002).

19  Futility of amendment may be shown by the plaintiff's failure to plead additional facts when

20  given the opportunity.  See In re Vantive, 283 F.3d 1098.

21         The court dismissed the CAC in the present case, in part, because plaintiffs failed to

22  plead particularized facts showing that defendants' statements regarding SST's prices and

23  inventory valuations were false or misleading.  The court granted leave to amend to correct

24  this deficiency.  In amending the complaint, plaintiffs added allegations regarding meetings,

25  databases and reports, along with information obtained from "confidential informants," and

26  generic industry data supplied by a market research company.

27         As noted above, however, the majority of the allegations regarding meetings,

28  databases, and reports are not directly connected to the allegations that defendants made

45

United States District Court

For the Northern District of California

false and misleading statements.  Similarly, the allegations regarding the "confidential informants" do not establish that the statements regarding SST's prices and inventory valuations were false at the time they were made.  Were these the only problems with the SAC, the court might grant leave to amend.  But a more serious problem is plaintiffs' reliance on generic data from Selantek as the source of their "facts" regarding the alleged falsity of defendants' statements regarding SST's prices and inventory valuations.

The court raised this issue at the hearing, and requested additional briefing regarding whether the use of generic data obtained from a market consultant satisfies the requirements of the PSLRA and <u>Silicon Graphics</u>, and regarding how the reliability of such material should be assessed by the court.  The court has considered the parties' responses in evaluating whether leave to amend is appropriate.

There is authority for the proposition that a plaintiff in a securities fraud action controlled by the requirements of the PSLRA can support its allegations of falsity with facts provided by an expert.  In <u>Nursing Home</u>, a case alleging false reporting of revenue and misrepresentations regarding sales projections by the Oracle defendants, the Ninth Circuit found that documents relating to the billing and payment histories of Oracle's customers, obtained by plaintiffs and analyzed by their financial expert, appeared to establish improper revenue adjustment.  <u>Nursing Home</u>, 380 F.3d at 1233-34.  The court noted that the plaintiff's expert, a former financial analyst for a recovery, audit, and cost-containment firm, who had reviewed the billing and payment histories of some of Oracle's customers and spoken with Oracle employees regarding customer payments, had provided specific and detailed reporting of the statements of the Oracle employees.  <u>Id.</u> at 1233.

Adopting the standard articulated in the Second Circuit's decision in <u>Novak v. Kasaks</u>, 216 F.3d 300 (2d Cir. 2000), the Ninth Circuit concluded that the complaint had described "the witnesses" (including plaintiff's financial expert) "with sufficient particularity to establish that they were in a position to know Oracle's accounting practices."  <u>Nursing Home</u>, 380 F.3d at 1233 (citing <u>Novak</u>, 216 F.3d at 314).  The court added, however, that what was even more important was that "the documents themselves appear to establish

United States District Court

For the Northern District of California

1   improper revenue adjustment" (referring to the documents analyzed by the financial

2   expert). Id. Subsequently, in In re Daou, the Ninth Circuit confirmed the use of the Novak

3   analysis in considering allegations of information obtained from the more typical

4   "confidential witness." In re Daou, 411 F.3d at 1015.

5          Accordingly, based on Nursing Home and In re Daou, it appears that district courts

6   can consider allegations of data and information obtained from "experts" – but also that

7   such factual allegations are subject to the same standard applied to evaluate facts alleged

8   to have originated with any "confidential informant" (or other witness).[10]

9          It is not clear, however, that the particularity requirements of the PSLRA allow a

10  plaintiff to base its factual assertions on generic market data provided by an industry

11  consultant. Plaintiffs have provided no persuasive authority in support of their argument

12  that courts have allowed "expert" opinion in the form of generic market data – without more

13  – as factual support for claims of securities fraud brought under the PSLRA.

14         Plaintiffs argue that the generic Selantek data is reliable because it corroborates the

15  statements from the confidential witnesses that SST's prices were falling during the class

16  period. They claim that the data corroborates those statements because their

17  "methodology" – based on that same generic data – shows what the actual valuation of

18  SST's inventory should have been. Other than Nursing Home and In re Daou, however,

19  the only opinion cited by plaintiffs or defendants that discusses factual allegations in a

20  securities fraud complaint based on information obtained by the plaintiffs from an expert is

21  In re Textainer Partnership Sec. Litig., 2006 WL 1328851 (N.D. Cal., May 15, 2006)

22

23

24

_____

25         [10] On the other hand, it is well-established that courts should not consider an expert or
26  other affidavit submitted in support of a Rule 12(b)(6) motion to dismiss, unless the parties
    have agreed that the motion will be treated as a motion for summary judgment. See, e.g.,
27  Branch v. Tunnell, 14 F.3d 449, 453 (9th Cir. 1994), overruled on other grounds by Galbraith
    v. County of Santa Clara, 307 F.3d 1119 (9th Cir. 2002). This rule applies even where the
28  affidavit is attached as an exhibit to the complaint. See DeMarco v. Depotech Corp., 149
    F.Supp. 2d 1212, 1220-22 (S.D. Cal. 2001).

United States District Court

For the Northern District of California

1   ("<u>Textainer II</u>").[11]

2       The <u>Textainer</u> action involved a claim that the defendant limited partnerships had

3   entered into an agreement for the sale of a fleet of used shipping containers, subject to the

4   approval of more than 50% of the limited partnership units in each of the partnerships.  In

5   connection with their solicitation of the approval of the limited partners to the sale,

6   defendants issued proxy statements stating that the general partners believed the sale was

7   "fair to and in the best interests of" the limited partners.

8       In the complaint, plaintiffs alleged that that statement was false because the price of

9   shipping containers had increased 18-20% between the time the defendants agreed on a

10  price and the date the proxy statements were issued.  Thus, according to plaintiffs, the

11  supposedly "fair" deal was actually at a price considerably below the prevailing market price

12  and was therefore not in the best interests of the limited partners.  The court dismissed the

13  complaint, in part because plaintiffs had not alleged facts supporting the claim that the

14  alleged price increase applied to the particular types of containers owned by the Textainer

15  partnerships.  <u>Textainer I</u>, 2006 WL 1328851 at *8.

16      In the amended complaint, plaintiffs supported their claim regarding the increase in

17  prices with information allegedly obtained from an industry consultant, who had performed

18  an analysis based on industry literature.  The court dismissed the complaint, granted leave

19  to amend, again dismissed the complaint, and again granted leave to amend.  In the final

20  order of dismissal, the court found that while plaintiffs had adequately alleged the factual

21  basis for a contention that the prices of new containers had increased 18-20% during the

22  relevant period, they had not alleged facts showing an increase in the prices of used

23  containers during the same period.  <u>Textainer IV</u>, 2007 WL 108320 at *6-8.  In other words,

24  they had not alleged facts supporting the claim that the alleged price increase applied to

25

26          [11]   The <u>Textainer</u> court issued four opinions on defendants' successive motions to
27  dismiss:  <u>In re Textainer</u>, 2005 WL 3801596 (N.D. Cal., Dec. 12, 2005) ("<u>Textainer I</u>"); <u>In re</u>
    <u>Textainer</u>, 2006 WL 1328851 (N.D. Cal., May 15, 2006) ("<u>Textainer II</u>"); <u>In re Textainer</u>, 2006
28  WL 3247425 (N.D. Cal., August 10, 2006) ("<u>Textainer III</u>"); and <u>In re Textainer</u>, 2007 WL
    108320 (N.D. Cal., Jan. 10, 2007) ("<u>Textainer IV</u>").

United States District Court

For the Northern District of California

1   the particular types of containers owned by the Textainer partnerships.

2          Here, the problem is two-fold.  First, the SAC does not plead sufficient facts about

3   Selantek to show that the company was likely to possess the information alleged.[12]

4   Second, the Selantek data is not based on information about SST's selling prices – or on

5   information about products identical to those being manufactured and sold by SST, in the

6   exact geographic area where SST was selling its products – but rather on generic market

7   data not tied to SST in any way, other than the general industry connection.

8          In addition, unlike the situation in Nursing Home or Novak, there are no allegations

9   of specific documents or statements by other witnesses that corroborate the generic

10  Selantek data.  There are allegations, based on information from the "confidential

11  witnesses," that "market prices" were falling, with vague references to "Asian" prices, but

12  none of those allegations provide details about specific products manufactured by SST.

13         Plaintiffs previously conceded that they do not have any information about SST's

14  costs or prices.  The court gave plaintiffs an opportunity to amend the complaint to allege

15  facts supporting their claims that defendants falsely stated that SST's prices were "firming"

16  or "improving" in 1Q04 and 2Q04, and overstated the value of SST's inventory when

17  releasing financial results for 1Q04, 2Q04, and 3Q04.

18         However, while the SAC is long, with many allegations that appear irrelevant to the

19  claims asserted – such as the allegations of information obtained from "confidential

20  informants" who had left their employment at SST long before the commencement of the

21  proposed class period; and the allegations of reports/databases of the kind that would be

22  routinely prepared by any company, but which do not contain any information that

23  contradicts the alleged false and misleading statements – the allegations are not sufficiently

24  particularized to satisfy the requirements of the PSLRA.  Accordingly, based on plaintiffs'

25

26  _____

27  [12] The court in Textainer found a similar problem, but the plaintiffs apparently remedied it to the court's satisfaction by identifying the consultant and providing information regarding the consultant's qualifications, and also by alleging facts regarding the factual content of the

28  sources and information on which the consultant had relied.  See Textainer IV, 2007 WL 108320 at *5-8.

1  concessions that they do not have any details about SST's prices or costs, and that the

2  Selantek data does not incorporate any SST pricing data in its generic database, the court

3  finds that further amendment would be futile.

### CONCLUSION

5       In accordance with the foregoing, the court finds that the second amended complaint

6  must be DISMISSED.  The dismissal is WITH PREJUDICE.

8  **IT IS SO ORDERED.**

9  Dated: March 9, 2007

_____

PHYLLIS J. HAMILTON
United States District Judge

**United States District Court**
For the Northern District of California